❐ Original

**CLERK'S OFFICE**
**A TRUE COPY**

Sep 14, 2020

s/ Jeremy Heacox

Deputy Clerk, U.S. District Court
Eastern District of Wisconsin

# UNITED STATES DISTRICT COURT

### for the
### Eastern District of Wisconsin

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched* | ) |
| *or identify the person by name and address)* | )    Case No. |
| Information related with the following Facebook UID, user and | ) |
| username:Michael Karmo 100005005115157 "Michael | )    **20-M- 391 (SCD)** |
| Karmo" / michael.karmo53 | ) |

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:    Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the     Eastern     District of     Wisconsin
*(identify the person or describe the property to be searched and give its location)*:

   See attachment A

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

   See attachment B

9-28-20

**YOU ARE COMMANDED** to execute this warrant on or before _____ *(not to exceed 14 days)*
   ❐ in the daytime 6:00 a.m. to 10:00 p.m.    ☒ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to    Honorable Stephen C. Dries    .
                                           *(United States Magistrate Judge)*

❐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
   ❐ for _____ days *(not to exceed 30)*    ❐ until, the facts justifying, the later specific date of _____ .

Date and time issued:    9-14-20, 5:15 pm                       *Judge's signature*

City and state:    Milwaukee, WI.                            Honorable Stephen C. Dries
                                                              *Printed name and title*

| Return | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |

Inventory made in the presence of :

Inventory of the property taken and name(s) of any person(s) seized:

## Certification

       I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

## <u>ATTACHMENT A</u>

*Property to Be Searched*

   This warrant applies to information between July 1, 2018, and the present date associated

with the Facebook accounts:

| USER | FACEBOOK IDENTIFICATION (UID) | FACEBOOK USER NAME |
|---|---|---|
| Michael Karmo | 100005005115157 | "Michael Karmo" / michael.karmo53 |
| Cody Smith | 100001639894773 | "Cody Smith" |

**ATTACHMENT B**
**Particular Things to be Seized**

**Information to be disclosed by Facebook**

  To the extent that the information described in Attachment A is within the possession, custody, or control of Facebook, including any messages, records, files, logs, or information that have been deleted but are still available to Facebook, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Facebook is required to disclose the following information to the government for each user ID listed in Attachment A:

  a. All contact and personal identifying information, including: full name, user identification number, birth date, gender, contact e-mail addresses, Facebook passwords, Facebook security questions and answers, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.

  b. All activity logs for the account and all other documents showing the user's posts and other Facebook activities;

  c. All photos and videos uploaded by that user ID and all photos and videos uploaded by any user that have that user tagged in them;

  d. All profile information; News Feed information; status updates; links to videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications;

e. All other records of communications and messages made or received by the user, including all encrypted or private messages, chat history, video calling history, and pending "Friend" requests;

f. All "check ins" and other location information;

g. All IP logs, including all records of the IP addresses that logged into the account;

h. All records of the account's usage of the "Like" feature, including all Facebook posts and all non-Facebook webpages and content that the user has "liked";

i. All information about the Facebook pages that the account is or was a "fan" of;

j. All past and present lists of friends created by the account;

k. All records of Facebook searches performed by the account;

l. All audio messages sent by the account and messages received by the account;

m. All video messages sent by the account and to the account;

n. Any and all location data that is recorded by Facebook related to the account

o. All information about the user's access and use of Facebook Marketplace;

p. The types of service utilized by the user;

q. The length of service (including start date) and the means and source of any payments associated with the service (including any credit card or bank account number);

r. All privacy settings and other account settings, including privacy settings for individual Facebook posts and activities, and all records showing which Facebook users have been blocked by the account;

s. All records pertaining to communications between Facebook and any person regarding the user or the user's Facebook account, including contacts with support services and records of actions taken.

2

**Information to be seized by the government**

All information described above that constitutes fruits, evidence and instrumentalities of violations of 18 U.S.C. §§ 922(g) (Possession of Firearms and Ammunition by a Prohibited Person) and 911 (Falsely Claiming U.S. Citizenship), and 26 U.S.C. § 5861(d) (Possession of Unregistered Silencer), since July 1, 2018, to the present, including, for each user ID identified on Attachment A, information pertaining to the following matters:

a.   The relevant offense conduct, any preparatory steps taken in furtherance of the scheme, communications between the suspects and others related to the relevant offense conduct in the above-listed crimes, communications related to travel, and communications related to the purchase of the Infiniti or any other property;

b.   Photographs or videos of firearms, silencers, ammunition, firearm accessories, body armor, or monitoring devices such as a drone in the suspect(s) possession or subject to the above-listed crimes;

c.   Evidence of the suspect(s) travel to other areas involved in unrest or protests, including but not limited to Chicago, Illinois, Seattle, Washington, or Portland, Oregon;

d.   Evidence indicating how and when the Facebook account was accessed or used, to determine the chronological and geographic context of account access, use, and events relating to the crime under investigation and to the Facebook account owner;

e.   Evidence indicating the Facebook account owner's state of mind, ideology, and intentions as it relates to the crimes under investigation or purpose of traveling to Kenosha, Wisconsin, and other cities;

f.   The identity of the person(s) who created or used the user ID, including records that help reveal the whereabouts of such person(s); and

3

g.  The identity of the person(s) who communicated with the user ID about matters relating to relevant offense conduct of the above-listed crimes, including records that help reveal their whereabouts.

CLERK'S OFFICE
A TRUE COPY
Sep 14, 2020
s/ Jeremy Heacox
Deputy Clerk, U.S. District Court
Eastern District of Wisconsin

AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

| | |
|---|---|
| In the Matter of the Search of<br><br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>Information related with the following Facebook UID, user and username:<br>Michael Karmo 100005005115157 "Michael Karmo" / michael.karmo53 | )<br>)<br>)<br>)<br>) | Case No. 20-M-391 (SCD) |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See attachment A

located in the _____ **Eastern** _____ District of _____ **Wisconsin** _____ , there is now concealed *(identify the person or describe the property to be seized):*

See attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☒ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| Title 18, United States Code,<br>Section 922(g)(1), Title 26,<br>United States Code, 5861(d) | Felon in Possession of Firearms and Ammunition<br>Possession of an Unregistered Firearm (Silencer)s |

The application is based on these facts:

See attached affidavit

☐ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
Applicant's signature

Mary Davidson, FBI SA
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_____ **Telephone** _____ *(specify reliable electronic means).*

Date: _____ **9-14-20** _____

_____
Judge's signature

City and state: **Milwaukee, WI.**

Honorable Stephen C. Dries
*Printed name and title*

# AFFIDAVIT IN SUPPORT OF
# AN APPLICATION FOR A SEARCH WARRANT

I, Mary Davidson, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application for a search warrant for information associated with two Facebook user IDs that are stored at premises owned, maintained, controlled, or operated by Facebook, a social networking company headquartered in Menlo Park, California. The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Facebook to disclose to the government records and other information in its possession, pertaining to the subscriber or customer associated with the user ID.

2.      I am a Special Agent with the Federal Bureau of Investigation (FBI) and have been since May 2019. Since October 2019, I have been assigned to FBI's Milwaukee Area Violent Crimes Task Force, a multi-jurisdictional law enforcement entity charged with investigating violations of federal law, including bank robberies, commercial robberies, armed motor vehicle robberies, and other violent crime matters, defined under Title 18 of the United States Code. I have been trained in a variety of investigative and legal matters, including the topics of Fourth Amendment searches, the drafting of search warrant affidavits, and probable cause. I have participated in criminal investigations, surveillance, search warrants, cellular telephone extractions, interviews, and debriefs of arrested subjects. As a result of this training and investigative experience, I have learned how and why violent actors typically conduct various aspects of their criminal activities.

3.       During the course of my career, I have had trainings regarding the use of social media in relation to criminal investigations.  Specifically, I have received instruction regarding the use of social media sites by criminal elements.  Additionally, I have conducted previous criminal investigations in which internet research that I conducted yielded the use of social media by suspects.  Specifically, I know from my training and experience that alleged suspects of criminal activity, who have accounts on social media websites, will often communicate their criminal intentions or past activity via "instant message" or "in-box message" on a given social media website.  The "instant message" / "in-box message" is a private communication from one user to another.  Furthermore, I know through experience that many social media users often use social media websites as their primary means to communicate with others.  Additionally, I know from training and experience that suspects who use social media websites sometimes post photographs of themselves possessing incriminating items, such as large amounts of cash, narcotics, and firearms.  Also, suspects in criminal investigations have been known to post statements on social websites referencing their own criminal activity.

4.       Information contained in this affidavit was either obtained directly by me or by other investigators who I believe to be truthful and credible. The facts in this affidavit come from personal observations, training and experience, and information obtained from other investigators and witnesses.

5.        This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

6.       Based on the investigation to date, there is probable cause that MICHAEL KARMO (DOB: XX/XX/1980) and CODY E. SMITH (DOB XX/XX/1987) were involved in the criminal activity described below.  More specifically, there is probable cause to believe that

2

on or about September 1, 2020, in Kenosha County, in the Eastern District of Wisconsin, and elsewhere, KARMO violated Title 18, United States Code, Section 922(g)(1) (Felon in Possession of Firearms and Ammunition) and Title 26, United States Code, 5861(d) (Possession of an Unregistered Firearm (Silencer)). In addition, there is probable cause to believe that on or about September 1, 2020, in Kenosha County, in the Eastern District of Wisconsin, and elsewhere, SMITH violated Title 18, United States Code, Sections 922(g)(1) and 2 (Aiding and Abetting a Felon's Possession of Firearms), Title 26, United States Code, 5861(d) (Possession of an Unregistered Firearm (Silencer)), Title 18, United States Code, Section 922(g)(9) (Possession of Firearms and Ammunition by a Prohibited Person – misdemeanor domestic violence), and Title 18, United States Code, Section 922(g)(3) (Possession of Firearms and Ammunition by a Prohibited Person – unlawful user of a controlled substance). In addition, the United States is investigating KARMO for possibly falsely claiming to be a United States citizen, including to the U.S. Probation Office, in violation of Title 18, United States Code, Section 911. Finally, there is probable cause to search the information described in Attachment A for evidence of these crimes, as described in Attachment B.

## **IDENTIFICATION OF ITEMS TO BE SEARCHED**

10.     I seek authorization to search the following Facebook accounts:

| USER | FACEBOOK IDENTIFICATION (UID) | FACEBOOK USER NAME |
|------|-------------------------------|---------------------|
| Michael Karmo | 100005005115157 | "Michael Karmo" / michael.karmo53 |
| Cody Smith | 100001639894773 | "Cody Smith" |

3

**PROBABLE CAUSE**

11.     Following the officer-involved shooting of Jacob Blake on August 23, 2020, federal, state, and local law enforcement was actively engaged in monitoring and responding to civil unrest and violence in Kenosha, Wisconsin. During the course of the unrest, rioters set fire to and damaged numerous buildings and vehicles, including arson to local businesses involved in interstate commerce, public buildings, and law enforcement property. Several people were injured. Wisconsin's Governor declared a state of emergency, and the National Guard was sent to Kenosha, Wisconsin. Many roads in Kenosha were closed to traffic, and the interstate highway exits near Kenosha were closed during the unrest, restricting interstate commerce. Unrest and looting continued, with confrontations between large groups of rioters and law enforcement on August 24 to August 25, 2020. On the evening of August 25, 2020, reports and video show numerous shots fired, including an armed individual who is charged with killing two people and injuring one person. Civil unrest continued to varying degrees in Kenosha over subsequent days, and the unrest regularly received national media coverage. A visit by the President of the United States planned for September 1, 2020, also received national media attention.

**Travel to Kenosha & Possession of Firearms**

12.     On September 1, 2020, at approximately 4:22 p.m., the Kenosha Police Department advised FBI that a law enforcement agency in Iowa had received a tip that MICHAEL KARMO and an unidentified male, later identified as CODY SMITH, were in possession of firearms and traveling from Missouri to Kenosha, Wisconsin, to loot and possibly "pick people off." The tip provided telephone number 619-708-3605 for KARMO. FBI also received photographs of text messages between KARMO and the tipster. The communications

4

reflected that KARMO sent a photograph of himself holding a rifle and another white male holding what appeared to be a shotgun. KARMO included the message, "This [is] the game changer" followed by a photograph of an assault rifle with a drum-style magazine attached to it.

13.     KARMO's text messages are shown below:



14.     After receiving the tip, law enforcement observed publicly viewable postings on the Facebook page with username "Michael Karmo." The cover photo on the page is the following:



15.     KARMO's Facebook page showed multiple pictures of an unidentified subject, believed to be KARMO, in possession of firearms, including assault-style rifles.  The following is a post from August 27, 2020:



16.     Examples from earlier posts included the following:



7



17.     Based upon the information from the tipster and the Facebook records, on September 1, 2020, law enforcement obtained location data from AT&T for telephone number 619-708-3605.  At approximately 6:48 p.m., records reflected that the mobile device operating with telephone number 619-708-3605 was in the area of the La Quinta Hotel & Inn located at 7540 118th Avenue, in Pleasant Prairie, Wisconsin.  Records reflected that between on or about August 31, 2020 and September 1, 2020, KARMO and SMITH drove across state borders from Missouri, to Iowa, and then to Wisconsin.

18.     On September 1, 2020, at approximately 7:40 p.m., FBI located and detained KARMO and SMITH outside of a Toyota Highlander vehicle in the parking lot of La Quinta Hotel & Inn located at 7540 118th Avenue, Pleasant Prairie, Wisconsin.  The vehicle was registered to Raad Jamil Karmo, with an address in Bonita, California.

19.     FBI received consent from KARMO and SMITH to search the 2019 Toyota Highlander, California registration 8NST519, VIN number 5TDZZRFH4KS361018.  The following items were recovered from the vehicle:

    a.   A black EP Armory AR-15, with muzzle device and optic, in gun case, bearing no Serial Number;

    b.   A Mossberg 500 AB 12-Gauge shotgun, bearing Serial Number 086982;

8

c. A Taurus PT92AF 9mm handgun, bearing Serial Number TIA60420;

d. A silencer;

e. Four (4) 30-round 5.56x45 caliber rifle magazines. One was empty, one had two rounds, and two were partially loaded with green-tip ammunition;

f. Two (2) 15-round, 9mm, handgun magazines, unloaded;

g. A black Ruger case containing two (2) 17-round, 9mm pistol magazines, fully loaded, plus three (3) 9mm rounds;

h. Five (5) 12 Gauge shotgun shells;

i. A black, 9mm magazine, partially loaded;

j. A black, firearm muzzle attachment;

k. A black Typhoon Drone with components in case;

l. An Army ACU pattern body armor, bearing Serial Number AR817651;

m. Black Molle tactical gear;

n. A black, LG2 cellular telephone, Model LM-Q710WA;

o. A small plastic bag containing a green leafy substance that field-tested positive for marijuana;

p. An orange and blue pipe that field-tested positive for the presence of marijuana;

q. A Safariland right leg holster; and

r. A folding knife, Brand Cold Steel, Model type Voyager, 5 ½" serrated blade.

20.     KARMO and SMITH also consented to a search of their hotel room, Room 148, at the La Quinta Hotel & Inn, and law enforcement subsequently obtained a search warrant. The following items were recovered from the hotel room:

a. A Ruger 9mm handgun, bearing Serial Number 336-16364 with one (1) 9mm round in chamber and one (1) magazine containing nine (9) 9mm rounds;

b. A Brand Cold Steel dagger, Model type Oyabun, 8 ¾" tanto blade with sheath;

9

c. A twisted cable survival saw;

d. A Remington 9mm Luger FMJ, 115 grain 100-round box with sixty-seven (67) rounds;

e. One hundred thirty-one (131) 12 Gauge shotgun shells;

f. A black Samsung S9+ cellular phone, model number SM-G965U;

g. An ACER laptop computer, Model – N15Q9;

h. A black mask;

i. A letter Karmo wrote;

j. Birth certificate in the name of Michael Karmo, issued in County of San Diego, California, with date of birth listed as January 10, 1980;

k. Birth certificate in the name of Miguel Karmo Orozco, issued in Tijuana, Mexico, with date of birth listed as August 14, 1980;

l. Clothing referencing assault rifles (matched photo of Karmo with assault rifle sent to tipster); and

m. Two bottles labeled "testosterone."

21.    KARMO and SMITH also consented to a search of their mobile telephones: a black Samsung S9+ (SMITH's); and a black LG2 cellular telephone (KARMO's). The telephone number associated with SMITH was 660-342-8785. SMITH had a contact listed as "KARMO" with telephone number 619-708-3605. The telephone number associated with KARMO's recovered cellular telephone was 619-708-3605, the same phone number for which law enforcement obtained location data.

22.    Karmo's phone included videos of Karmo and Smith in Kenosha, texts about guns and drugs, photos of firearms, and other items of interest. In one video, Karmo announced that they had arrived in Kenosha. He details the firearms they have with them. In one video,

10

KARMO announced that they had arrived in Kenosha and includes "Mr. Ruger" is with them. KARMO notes that it might get crazy after curfew, "when the thugs come out… when the tough guys come out." After SMITH remarks that curfew is at 7:00 p.m., KARMO says, "We'll be out about 12, midnight… whenever we're needed." KARMO adds that they won't have to act "if [they] see the police are handling business and not standing down. If [they] see that the National Guard are engaging protestors." In another video, while outside of Kenosha Bradford High School awaiting President Trump's visit, Karmo pans over a group of protestors and refers to them as "a bunch of victims" and says that "all these MFs gonna go." Finally, in another video, KARMO and SMITH are in the middle of a group of individuals chanting "Justice for Jacob Blake." KARMO indicates they are "hanging out on the enemy's side." KARMO directs his attention toward an individual with a megaphone while he is walking towards SMITH and indicates that he's going "to lay this punk out with the fucking megaphone." Once he reaches SMITH, he indicates he will "lay this motherfucker out as soon as the lights go out."

23.     Karmo's text messages include not only the exchange with the tipster but texts such as the following from July 1, 2020: "[A]ll I care about is fucking up antifas and black lives matters mother fuckers these days . been driving back and forth across America going to the where they be rioting the hardest . I'm in Chicago right now ."

24.     Smith's phone included things like pictures of himself and his young children holding assault rifles. He also texts a contact to explain that in case "anything pops off," he wanted the contact to know he was going to Portland to meet some people "for a thing."

25.     SMITH's phone had the Facebook messenger application open when it was seized on September 1, 2020. Visible on the Facebook application was a message that read "Michael sent a video" at 7:31 PM (on September 1, 2020) from contact "Michael Karmo." The Facebook

11

user account on SMITH's phone is username "Cody Smith" with UID 100001639894773. In addition, a relative of SMITH reported that he received a video from SMITH while SMITH was in Kenosha with KARMO. In the video, KARMO was attempting to recruit people for violence.

26.    KARMO has prior convictions for vehicle theft, burglary, violation of parole, felon in possession of firearm, evading peace officer resulting in injury/death, receive known stolen property, and possession of controlled substances in California, some of which are felonies. Therefore, KARMO was prohibited from possessing firearms and ammunition on September 1, 2020.

27.    SMITH has a prior 2009 misdemeanor domestic battery conviction from the State of California: Riverside County Case Number INM194727. According to the complaint in that matter, the victim was a spouse, ex-spouse, individual with whom Smith had been cohabitating, or individual with whom SMITH had a child. Therefore, SMITH was prohibited from possessing firearms and ammunition on September 1, 2020.

28.    A Special Agent with the Bureau of Alcohol, Tobacco, Firearms, and Explosives examined all of the seized firearms from the vehicle and hotel room and determined that none of the firearms were manufactured in Wisconsin and had all traveled in interstate commerce prior to September 1, 2020. The agent reported that the EP Armory AR-15, black, with muzzle device and optic, was a home-made firearm insofar as the receiver was manufactured in Texas, but the remaining parts of the firearm would have been obtained from a build kit to complete the AR-15. Finally, the agent examined the silencer and determined that it qualified as a "firearm silencer" or "firearm muffler" under Title 18, United States Code, Section 921(a)(24).

**Interviews of Smith & Karmo**

29.     SMITH was interviewed by FBI agents on September 1, 2020. After waiving his Miranda rights, SMITH indicated that he and KARMO traveled from Missouri, where they lived together, to Kenosha for the President Trump rally on September 1, 2020. After their visit to Wisconsin, they intended to travel to Detroit, Idaho, Washington, and Oregon. SMITH described that he had an uncle in the Northwest who owned a dispensary and could supply them with marijuana.

30.     SMITH explained that he and KARMO left their home in Missouri around 4:00 p.m. on August 31, 2010. Around 2:00 a.m. on September 1, 2020, they stopped to visit a friend of KARMO's in Iowa. From there, they drove approximately four hours to Kenosha, where they arrived early in the morning on September 1, 2020.

31.     SMITH stated they attended the rally for President Trump outside of the high school in Kenosha. SMITH stated they wanted to see proof of the rioting. He reported that both of the pistols were locked in the glove compartment of KARMO's vehicle while they were at the rally. They brought the guns because they did not want to leave them unattended in the hotel room.

32.     Regarding the firearms recovered by law enforcement, SMITH initially stated that he currently had eleven firearms, four (4) of which he brought to Kenosha. SMITH later stated that one of the four firearms brought to Kenosha, the pistol (the Taurus PT92AF 9mm handgun), belonged to KARMO. SMITH reported that KARMO bought the handgun from an employee at Missouri Cooperage, where they both worked. SMITH reported that KARMO also owned an assault rifle.

13

33.     SMITH stated that he and KARMO took a picture of themselves holding the long guns while they were packing for their trip to Kenosha, Wisconsin.

34.     When questioned about what appeared to be a silencer found in the vehicle, SMITH stated that the silencer belonged to KARMO.  He described it as being made of thin metal and washers.  SMITH did not believe that the silencer worked, but KARMO wanted to test it.  SMITH reported the silencer could be used on a 9mm handgun and an assault rifle.

35.     SMITH acknowledged that he knew that KARMO was a convicted felon and that KARMO could not legally possess a firearm.

36.     SMITH stated that he and KARMO regularly smoked marijuana after work. He stated that he used marijuana as a form of self-medication almost every night. SMITH also stated he used cocaine and methamphetamines in the past.

37.     When discussing his criminal history, SMITH explained that when he was approximately 24 years old, he caught his girlfriend cheating on him and wrecked her car.  At the time, SMITH and his girlfriend lived in California.  She pressed charges and SMITH was arrested for domestic abuse.  SMITH claimed not to remember the details clearly because he was using marijuana.

38.     After waiving his rights, KARMO also agreed to speak with agents.  The interview was recorded. KARMO stated that KARMO and SMITH have been roommates in Hartville, Missouri, for approximately four weeks.  They worked together and are part of the 417 Second Amendment Militia. On August 31, 2020, KARMO and SMITH decided to drive to Kenosha to "see for themselves" what was going on regarding the riots. On the way, they stopped in Iowa to visit someone KARMO knew.  KARMO stated that he was offended because

14

this individual commented that KARMO and SMITH looked like they were heading to Kenosha to shoot people.

39.     KARMO stated that KARMO and SMITH then drove to a La Quinta Hotel in Pleasant Prairie, Wisconsin.  They arrived between 3:00 a.m. and 4:00 a.m. on September 1, 2020.  KARMO stated that later in the morning, they attended the "Make America Great Again" rally at the high school.  KARMO stated that they parked their vehicle with all of their belongings near the rally.  After the rally, KARMO and SMITH went back to the hotel, and they planned to see what Kenosha was like at night. KARMO stated that after Kenosha, they planned to go to Portland, Oregon, to see for themselves what was going on.  KARMO stated that he would be willing to "take action" if police were defunded.

40.     KARMO claimed that he did not own any firearms except an air rifle. KARMO stated that his prints "probably" were not on any of the guns but could be on the boxes they were in from moving luggage around in the vehicle. KARMO claimed he had not shot a gun for many years. KARMO stated that SMITH brought all of his guns except one Palmetto State Armory AR rifle, which was left at home. KARMO stated that he knew it was risky to be around people with guns. KARMO explained that it was worth the risk in the event KARMO ever needed to use a gun to protect himself or others. KARMO claimed that he never carried a pistol and that he only brought body armor and a drone on their trip.

41.     KARMO stated he was aware of a domestic violence conviction SMITH had in California.  KARMO claimed that he did not know anything about any suppressors or silencers found in their vehicle.  Regarding a letter found in his hotel room, KARMO stated that he wrote the letter to his sons approximately five years prior to explain that he had a calling to leave California and learn to live off the land.

15

**Search of Missouri Residence**

42.    On September 3, 2020, agents executed a federal search warrant at the home shared by Karmo and Smith in Missouri.  On a table in the living room, agents found two 30-round magazines for an AR-15.  In a "bunker" or "safe room" in the basement, agents found three pistols, a shotgun, a loaded drum magazine for an AR-15, fourteen different magazines, a large amount of various-caliber ammunition, and a possible homemade suppressor.

## FACEBOOK INFORMATION

43.    Facebook owns and operates a free-access social networking website of the same name that can be accessed at http://www.facebook.com.  Facebook allows its users to establish accounts with Facebook, and users can then use their accounts to share written news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.

44.    Facebook asks users to provide basic contact and personal identifying information to Facebook, either during the registration process or thereafter.  This information may include the user's full name, birth date, gender, contact e-mail addresses, Facebook passwords, Facebook security questions and answers (for password retrieval), physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.  Facebook also assigns a user identification number to each account.

45.    Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network.  Facebook assigns a group identification number to each group.  A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request."  If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can

16

exchange communications or view information about each other.  Each Facebook user's account includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

46.     Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts.  By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users.  A Facebook user can also create "lists" of Facebook friends to facilitate the application of these privacy settings.  Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

47.     Facebook users can create profiles that include photographs, lists of personal interests, and other information.  Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet.  Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list.  In addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times.  A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

48.     Facebook allows users to upload photos and videos, which may include any metadata such as location that the user transmitted when s/he uploaded the photo or video.  It also provides users the ability to "tag" (i.e., label) other Facebook users in a photo or video.

17

When a user is tagged in a photo or video, he or she receives a notification of the tag and a link to see the photo or video. For Facebook's purposes, the photos and videos associated with a user's account will include all photos and videos uploaded by that user that have not been deleted, as well as all photos and videos uploaded by any user that have that user tagged in them.

49.     Facebook users can exchange private messages on Facebook with other users. These messages, which are similar to e-mail messages, are sent to the recipient's "Inbox" on Facebook, which also stores copies of messages sent by the recipient, as well as other information. Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile. In addition, Facebook has a Chat feature that allows users to send and receive instant messages through Facebook. These chat communications are stored in the chat history for the account. Facebook also has a Video Calling feature, and although Facebook does not record the calls themselves, it does keep records of the date of each call.

50.     If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

51.     Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages. Facebook users can "like" Facebook posts or updates, as well as webpages or content on third-party (*i.e.*, non-Facebook) websites. Facebook users can also become "fans" of particular Facebook pages.

52.     Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

53.     Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception the account to the present. The activity log

18

includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Facebook page or adding someone as a friend. The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

54.    Facebook Notes is a blogging feature available to Facebook users, and it enables users to write and post notes or personal web logs ("blogs"), or to import their blogs from other services, such as Xanga, LiveJournal, and Blogger.

55.    The Facebook Gifts feature allows users to send virtual "gifts" to their friends that appear as icons on the recipient's profile page. Gifts cost money to purchase, and a personalized message can be attached to each gift. Facebook users can also send each other "pokes," which are free and simply result in a notification to the recipient that he or she has been "poked" by the sender.

56.    Facebook also has a Marketplace feature, which allows users to post free classified ads. Users can post items for sale, housing, jobs, and other items on the Marketplace.

57.    In addition to the applications described above, Facebook also provides its users with access to thousands of other applications ("apps") on the Facebook platform. When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

58.    Some Facebook pages are affiliated with groups of users, rather than one individual user. Membership in the group is monitored and regulated by the administrator or head of the group, who can invite new members and reject or accept requests by users to enter. Facebook can identify all users who are currently registered to a particular group and can identify the administrator and/or creator of the group. Facebook uses the term "Group Contact

19

Info" to describe the contact information for the group's creator and/or administrator, as well as a PDF of the current status of the group profile page.

59. Facebook uses the term "Neoprint" to describe an expanded view of a given user profile. The "Neoprint" for a given user can include the following information from the user's profile: profile contact information; News Feed information; status updates; links to videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications.

60. Facebook also retains Internet Protocol ("IP") logs for a given user ID or IP address. These logs may contain information about the actions taken by the user ID or IP address on Facebook, including information about the type of action, the date and time of the action, and the user ID and IP address associated with the action. For example, if a user views a Facebook profile, that user's IP log would reflect the fact that the user viewed the profile, and would show when and from what IP address the user did so.

61. Social networking providers like Facebook typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number). In some cases, Facebook users may communicate directly with Facebook about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users. Social networking providers like Facebook typically retain records about such communications, including records of contacts

20

between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

62.     As explained herein, information stored in connection with a Facebook account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion.  In my training and experience, a Facebook user's "Neoprint," IP log, stored electronic communications, and other data retained by Facebook, can indicate who has used or controlled the Facebook account.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  For example, profile contact information, private messaging logs, status updates, and tagged photos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the Facebook account at a relevant time.  Further, Facebook account activity can show how and when the account was accessed or used.  For example, as described herein, Facebook logs the Internet Protocol (IP) addresses from which users access their accounts along with the time and date.  By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation.  Such information allows investigators to understand the geographic and chronological context of Facebook access, use, and events relating to the crime under investigation.  Additionally, Facebook builds geo-location into some of its services.  Geo-location allows, for example, users to "tag" their location in posts and Facebook "friends" to locate each other.  This geographic and timeline information may tend to either inculpate or exculpate the Facebook account owner.  Last, Facebook account activity may provide relevant insight into the Facebook account owner's

state of mind as it relates to the offense under investigation. For example, information on the Facebook account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

63. Therefore, the computers of Facebook are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access information, transaction information, and other account information.

## INFORMATION TO BE SEARCHED AND ITEMS TO BE SEIZED

64. I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Facebook to disclose to the government copies of the records and other information (including the content of communications) particularly described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

## CONCLUSION

65. Based on the forgoing, I request that the Court issue the proposed search warrant. This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A). Specifically, the Court of the Eastern District of Wisconsin is a district court of the United States that has jurisdiction over the offenses being investigated, 18 U.S.C. § 2711(3)(A)(i). Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

## ATTACHMENT A

*Property to Be Searched*

This warrant applies to information between July 1, 2018, and the present date associated with the Facebook accounts:

| USER | FACEBOOK IDENTIFICATION (UID) | FACEBOOK USER NAME |
|------|-------------------------------|--------------------|
| Michael Karmo | 100005005115157 | "Michael Karmo" / michael.karmo53 |
| Cody Smith | 100001639894773 | "Cody Smith" |

**ATTACHMENT B**
**Particular Things to be Seized**

**Information to be disclosed by Facebook**

To the extent that the information described in Attachment A is within the possession, custody, or control of Facebook, including any messages, records, files, logs, or information that have been deleted but are still available to Facebook, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Facebook is required to disclose the following information to the government for each user ID listed in Attachment A:

a. All contact and personal identifying information, including: full name, user identification number, birth date, gender, contact e-mail addresses, Facebook passwords, Facebook security questions and answers, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.

b. All activity logs for the account and all other documents showing the user's posts and other Facebook activities;

c. All photos and videos uploaded by that user ID and all photos and videos uploaded by any user that have that user tagged in them;

d. All profile information; News Feed information; status updates; links to videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications;

e.  All other records of communications and messages made or received by the user, including all encrypted or private messages, chat history, video calling history, and pending "Friend" requests;

f.  All "check ins" and other location information;

g.  All IP logs, including all records of the IP addresses that logged into the account;

h.  All records of the account's usage of the "Like" feature, including all Facebook posts and all non-Facebook webpages and content that the user has "liked";

i.  All information about the Facebook pages that the account is or was a "fan" of;

j.  All past and present lists of friends created by the account;

k.  All records of Facebook searches performed by the account;

l.  All audio messages sent by the account and messages received by the account;

m.  All video messages sent by the account and to the account;

n.  Any and all location data that is recorded by Facebook related to the account

o.  All information about the user's access and use of Facebook Marketplace;

p.  The types of service utilized by the user;

q.  The length of service (including start date) and the means and source of any payments associated with the service (including any credit card or bank account number);

r.  All privacy settings and other account settings, including privacy settings for individual Facebook posts and activities, and all records showing which Facebook users have been blocked by the account;

s.  All records pertaining to communications between Facebook and any person regarding the user or the user's Facebook account, including contacts with support services and records of actions taken.

2

**Information to be seized by the government**

All information described above that constitutes fruits, evidence and instrumentalities of violations of 18 U.S.C. §§ 922(g) (Possession of Firearms and Ammunition by a Prohibited Person) and 911 (Falsely Claiming U.S. Citizenship), and 26 U.S.C. § 5861(d) (Possession of Unregistered Silencer), since July 1, 2018, to the present, including, for each user ID identified on Attachment A, information pertaining to the following matters:

a. The relevant offense conduct, any preparatory steps taken in furtherance of the scheme, communications between the suspects and others related to the relevant offense conduct in the above-listed crimes, communications related to travel, and communications related to the purchase of the Infiniti or any other property;

b. Photographs or videos of firearms, silencers, ammunition, firearm accessories, body armor, or monitoring devices such as a drone in the suspect(s) possession or subject to the above-listed crimes;

c. Evidence of the suspect(s) travel to other areas involved in unrest or protests, including but not limited to Chicago, Illinois, Seattle, Washington, or Portland, Oregon;

d. Evidence indicating how and when the Facebook account was accessed or used, to determine the chronological and geographic context of account access, use, and events relating to the crime under investigation and to the Facebook account owner;

e. Evidence indicating the Facebook account owner's state of mind, ideology, and intentions as it relates to the crimes under investigation or purpose of traveling to Kenosha, Wisconsin, and other cities;

f. The identity of the person(s) who created or used the user ID, including records that help reveal the whereabouts of such person(s); and

3

g. The identity of the person(s) who communicated with the user ID about matters relating to relevant offense conduct of the above-listed crimes, including records that help reveal their whereabouts.